UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIETA DAHMLOW, Plaintiff, v. MICHAEL J. ASTRUE, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant. | Case No. CV 06-3991-PJW<br>MEMORANDUM OPINION AND ORDER |

I.

INTRODUCTION

Before the Court is Plaintiff's appeal of a decision by Defendant Social Security Administration ("the Agency"), denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the decision is reversed and the case is remanded for further proceedings.

II.

SUMMARY OF PROCEEDINGS

After Plaintiff's applications were denied by the Administrative Law Judge ("ALJ") and the Appeals Council, Plaintiff filed an action in this Court, seeking to have the Agency's decision overturned. On

December 24, 2003, the parties stipulated to remand the case to the Agency to "reevaluate the severity of Plaintiff's seizure disorder with reference to the Listings," and to reexamine the issue of Plaintiff's credibility. (Administrative Record ("AR") 380-81.)

On November 7, 2005, a hearing was conducted before a different ALJ. (AR 323-43.) On December 2, 2005, that ALJ denied Plaintiff's application in a written decision. (AR 306-17.) Plaintiff's request for review was denied by the Appeals Council on March 24, 2006. (AR 301-03.) On June 23, 2006, Plaintiff lodged a Complaint in this Court, raising three grounds for review:

1. The ALJ did not properly evaluate Plaintiff's epilepsy.
2. The ALJ did not properly evaluate Plaintiff's mental impairments.
3. The ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's subjective complaints.

(Joint Stip. at 3.)

III.

ANALYSIS

A. Standard of Review

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn the Agency's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

B. <u>The ALJ's Evaluation Of The Medical Evidence</u>

Plaintiff claims that the ALJ erred in concluding that her epilepsy was controlled when she was compliant with her medications and, therefore, assuming that she was compliant, could still perform her past relevant work. Plaintiff contends that this finding was erroneous and that the record established that she suffered seizures even when she took her medications as prescribed. (Joint Stip. at 4.) For the following reasons, this claim is rejected.

The ALJ detailed treatment records from Plaintiff's treating physician, Dr. Mitchell Kaufman, which revealed that Plaintiff had not always been compliant in taking her medication, but that, when she was, her seizures were largely well-controlled. For example, in a neurological consultation letter dated January 5, 2000, Dr. Kaufman stated that Plaintiff "may occasionally miss a dose of both anticonvulsant agents [Dilantin and Depakote]." (AR 671.) In the same report, Dr. Kaufman noted subtherapeutic levels of these medications and increased the prescription level of Depakote. (AR 672, 674.)

In a report dated January 31, 2000, Dr. Kaufman noted that Plaintiff "ran out of Depakote on 1/15/00 and did not take this

medication for 72 hours," and, thereafter, experienced grand mal seizures on consecutive days from January 20 to 22. (AR 667-68.) He remarked that, "[a]side from recent breakthrough seizures presumably attributed to a subtherapeutic Depakote level, [Plaintiff]'s epilepsy appears better controlled with a higher maintenance dose of Depakote," and again increased Plaintiff's Depakote prescription. (AR 669.)

On April 10, 2000, Dr. Kaufman stated that "much better seizure control has been attained after increasing the maintenance dose of Depakote," but noted that "sporadic breakthrough episodes continue to occur." (AR 657.) He prescribed Mysoline to "ameliorate recent onset tremor" and "provide better seizure control." (AR 658.) On May 31, 2000, Dr. Kaufman reported that Plaintiff had been unable to refill her Depakote prescription while vacationing in Mexico and had been taking smaller than prescribed doses for the previous three weeks. (AR 655.) Dr. Kaufman attributed three "breakthrough simple partial seizures" to the subtherapeutic levels of her medications and specifically noted that Plaintiff "realizes how fortunate she was that more severe seizures did not occur while taking only 60% of the recommended Depakote maintenance dose for the past several weeks." (AR 655-56.)

On August 28, 2000, Dr. Kaufman noted that Plaintiff had reported an average of three to four "aura" episodes each month, despite apparent compliance with her medication.[1] (AR 653.) However, Dr. Kaufman also noted various stressors that Plaintiff was experiencing

---

[1] Plaintiff described these "aura" episodes as causing her to "just stare, but I don't even remember looking" for approximately three to five minutes, after which she feels "very tired." (AR 364.)

in her life during this period, including not sleeping or eating well and dealing with a screaming child who was experiencing separation anxiety in kindergarten. (AR 653.)

On October 11, 2000, Dr. Kaufman noted that Plaintiff had experienced a nighttime "breakthrough seizure" episode one week before her visit. (AR 651.) He attributed this episode to Plaintiff not taking her medication, noting that, "[b]ecause breakthrough seizures appeared a few days after running out of phenobarbital, recurrent ictal activity is not worrisome at this time."[2] (AR 651.)

On November 20, 2000, Dr. Kaufman noted a possible nighttime seizure that did not appear to cause Plaintiff any distress or loss of functioning. (AR 649.) He opined that "a breakthrough ictal episode did not occur." (AR 650.) That same day Dr. Kaufman completed a form entitled "Seizures Residual Functional Capacity Questionnaire," on which he noted that Plaintiff experienced an average of one to two seizures per month, which were precipitated, in his opinion, by "stress, lack of sleep, illness, missed dose of medication." (AR 659-60.) Dr. Kaufman noted that Plaintiff had a "favorable response" to Depakote. (AR 661.) Additionally, and despite the records to the contrary, Dr. Kaufman indicated that Plaintiff was compliant with her medication. (AR 661.)

On December 18, 2000, Dr. Kaufman noted Plaintiff's report of two "aura" seizures occurring on December 6 and 7, which Plaintiff

[2] "Ictal" is defined as "referring to a sudden, sharp onset, as convulsions of an epileptic seizure." The Mosby Medical Encyclopedia.

believed to be stress-related. (AR 646.) Dr. Kaufman increased Plaintiff's dose of Mysoline for tremor reduction and improved seizure control. (AR 647.)

On January 22, 2001, Dr. Kaufman noted that "no obvious seizures have appeared since the last visit," but commented on a nighttime episode where Plaintiff had awoken suddenly feeling "very scared," an event he thought might represent a breakthrough simple, partial seizure. (AR 643-44.)

Plaintiff was not seen by Dr. Kaufman again until April 23, 2001. On that visit, she reported that her seizures were pretty well controlled when she took her medication. (AR 639.) Dr. Kaufman thought that a single aura episode occurring on February 12, 2001, was possibly stress-related. (AR 639.) He opined that, "[f]rom a neurological perspective, [Plaintiff] is clinically stable with respect to her seizure disorder as long as she maintains the same anticonvulsant regimen," and recommended that she return for an updated reassessment in four months. (AR 640.)

On August 27, 2001, Dr. Kaufman saw Plaintiff again. He noted a "probable seizure" occurring on July 8, 2001, during which Plaintiff "experienced an approximate two minute episode characterized by rapid heartbeat and a feeling of fear." (AR 636.) He also noted that blood tests revealed that Plaintiff's medication was at a therapeutic level. (AR 636.) Dr. Kaufman attributed the solitary episode to lack of sleep and, consequently, did not change Plaintiff's medication level. (AR 637.) He recommended that she return six months later. (AR 637.)

On February 25, 2002, Plaintiff returned to see Dr. Kaufman. He noted that Plaintiff reported no seizure activity for a six-month period, during which Plaintiff had been taking her medication. (AR

633.) Plaintiff did report, however, that on January 31, 2002, she experienced an "aura," "described as a 3-4 second episode of feeling panicky," an event which she experienced again for several consecutive days before meeting with Dr. Kaufman. (AR 633.) Dr. Kaufman did not rule out breakthrough simple, partial seizures, but also considered the possibility of anxiety attacks and prescribed Effexor for anxiety. (AR 634.)

On April 10, 2002, Dr. Kaufman noted that Plaintiff reported less anxiety and no seizure-like events since her last visit. (AR 631.) On October 9, 2002, Dr. Kaufman noted Plaintiff's report of two brief seizure episodes in June and September 2002, each lasting no more than six seconds. (AR 628.) Dr. Kaufman also noted that her seizures appeared well-controlled and he did not adjust her Depakote or Mysoline prescriptions. (AR 629.)

On April 9, 2003, Dr. Kaufman noted that Plaintiff reported taking no anticonvulsants for a period of four to five weeks in October and November 2002, due to problems with her medical insurance. (AR 625.) On December 27, 2002, Plaintiff experienced three small seizure episodes; on January 27, 2003, she experienced two episodes; and, on March 24 and 25, 2003, she experienced "single events." (AR 625.) Dr. Kaufman attributed these partial seizures to "subtherapeutic anticonvulsant serum levels." (AR 625.)

Based on this evidence, the ALJ concluded that Plaintiff was non-compliant with her medication regimen and that, if she was compliant, the seizures would stop and she could perform her past work as a cashier and receptionist. (AR 315.) Plaintiff takes exception to this finding. She contends that the records show that she had seizures even when she was compliant.

The Court agrees that occasionally Plaintiff experienced seizures, or some form of seizures, like "auras," even when she was taking her medications as prescribed. The record also shows, however, that these episodes were much less severe and much less frequent when she was compliant. Further, during much of the time when she was taking her medications as prescribed, there were no seizures. Most significant in this entire analysis, however, is Plaintiff's treating physician's view that Plaintiff's seizures were the result of her failure to take her medications and that, when she took her medications, her seizures were controlled. (AR 629, 639, 640, 655-57, 661, 669.) The ALJ was entitled to rely on this opinion and conclude that Plaintiff's condition was controllable with medication. Assuming that Plaintiff could control her seizures with medication, they would not preclude her from performing her work as a cashier/receptionist, and the ALJ did not err in reaching this conclusion.[3]

C. <u>The ALJ's Evaluation Of Plaintiff's Mental Impairments</u>

In Plaintiff's second claim, she contends that the ALJ erred when he determined at step two that Plaintiff's mental impairments were not severe. (Joint Stip. at 14-19.) For the following reasons, the Court agrees with Plaintiff.

At step two of the sequential evaluation process, the ALJ is tasked with identifying which impairments have more than a minimal effect on a claimant's ability to do basic work. *Webb v. Barnhart*,

[3] Plaintiff raises for the first time that the subtherapeutic levels of medicine in her blood could be due to her body's inability to properly metabolize her medications. (Joint Stip. at 8.) There is no support in the record for this claim. Nor has any expert offered this opinion. As such, it is rejected.

433 F.3d 683, 686 (9th Cir. 2005). This is supposed to be a *de minimis* screening device and is intended to dispose of only groundless claims. *Id*. at 687.

State agency examining psychologist Dr. Dan Matzke diagnosed Plaintiff with a cognitive disorder (impaired intellectual functioning with deficits in memory and concentration), not otherwise specified, and a depressive disorder, not otherwise specified. (AR 703.) Dr. Matzke assessed Plaintiff's ability to maintain concentration, persistence, and pace; understand, remember, and carry out complex job instructions; respond appropriately to co-workers, supervisors, and the public; and respond appropriately to work situations/requirements as fair, meaning "markedly limited, but not precluded." (AR 703-04.) The reviewing state agency psychiatrist determined that Plaintiff would have "moderate" limitations in maintaining concentration, persistence, and pace. (AR 715.)

Contrary to these findings, the ALJ found that Plaintiff's mental impairments were non-severe and resulted only in "mild" restrictions in functioning. (AR 313-14.) In reaching this conclusion, he rejected the more severe restrictions found by psychologist Matzke and the reviewing state agency psychiatrist. The ALJ rejected Dr. Matzke's assessment because he concluded that it was based on the premise that Plaintiff suffered from a cognitive disorder, resulting from her seizure disorder. (AR 314.) The ALJ reasoned that, if Plaintiff took her medications as prescribed, she would not experience the degree of mental impairment assessed by Dr. Matzke. (AR 314.) Additionally, the ALJ found that the "moderate" limitation assessed by Dr. Matzke was inconsistent with Dr. Matzke's finding that Plaintiff had "mild deficits" in concentration and attention, and could handle

money (i.e., a checking account). The ALJ also noted that Plaintiff did not have any observable severe cognitive, emotional, or behavioral dysfunction. (AR 314, 700-02.) The ALJ pointed out that the previous ALJ's finding that Plaintiff did not have a mental impairment had not been disturbed on appeal, that the record showed no ongoing treatment for a psychological disorder, and that previous neurological examinations by Drs. Lee and Kim had failed to show "memory deficits" to support Dr. Matzke's conclusions. (AR 314, 589-98, 744-53.) As explained below, none of these reasons supports the ALJ's step-two finding that Plaintiff's mental impairment was not severe.

The ALJ concluded that, if Plaintiff took her medication, she would not suffer seizures and would not experience cognitive problems caused by the seizures. (AR 314.) The clear implication of this finding is that Plaintiff's cognitive problems were temporal and would dissipate if Plaintiff stopped having seizures. The problem with this analysis is that overlooks the fact that Plaintiff regularly suffered seizures over the years. (AR 311-12.) What Plaintiff raises here, and what the ALJ did not address, is the impact those seizures had on Plaintiff's cognitive functioning. Though the Court assumes that, if Plaintiff complied with her doctor's orders and took her medication she would not have had seizures, that does not answer the question of whether a lifetime of seizures has adversely affected her ability to think. Certainly, the experts who examined and tested Plaintiff have discerned some cognitive deficits, which may be linked to her seizures. (AR 703, 715.) That these deficits may have been avoided had Plaintiff taken her medication is not in issue. What is in issue is whether Plaintiff's cognitive disorder and borderline intellectual functioning affects her ability to work. By concluding at step two

that Plaintiff's mental impairment was not severe, the ALJ sidestepped this issue. On remand, he should address it.

The ALJ's other justifications for concluding that Plaintiff's cognitive impairment was not severe are equally unavailing. For example, he noted that Plaintiff was able to graduate from high school and complete one year of college. (AR 313.) Again, this has little relevance to Plaintiff's cognitive state 20 years after that schooling, where Plaintiff suffered repeated seizures over the course of that period.

The ALJ also relied on the fact that Plaintiff handles money and has a checking account. The Court is unclear as to the significance of these facts.[4] Dr. Matzke understood that Plaintiff handled money and had a checking account and still concluded that she had cognitive deficits. (AR 702-04.) It appears that the ALJ was reaching a different conclusion, i.e., that people who can handle money and a checking account are not cognitively impaired, when he found that Plaintiff's impairment was not severe. The Court wonders out loud as to the ALJ's basis for such a conclusion. Assuming he had one, he did not provide it to the Court for review. As such, it is rejected.

---

[4] The Court is aware that Plaintiff's prior employment was as a cashier/receptionist. Though being able to handle money in her personal life and maintain a checking account may be indicative of an ability to handle money as a cashier at work, the two are not synonymous. Being a cashier involves continuously dealing with money under some time pressure. Handling one's own funds does not necessarily require the same skills. For instance, Plaintiff would presumably have unlimited time to write a check to pay a bill. And though there may be some minimal cognitive functioning needed to pay for groceries at a check-out counter, it would not require the same abilities as a cashier. Thus, not everyone who can buy groceries at a store could also work as a cashier at the store.

The ALJ also relied on the fact that the 2003 district court remand order and the 2004 Appeals Council decision did not overrule the previous ALJ's determination that Plaintiff did not suffer from a severe mental impairment. (AR 314.) The Court faults this analysis for several reasons. First, the remand order was based on the parties' stipulation. It was not a reasoned decision by the Court. Second, the Appeals Council's order was simply an administrative order to pass through to the ALJ the district court's order. The Appeals Council did not analyze the issues on its own. Despite that fact, the Appeals Council did instruct the ALJ to offer the Plaintiff an opportunity to be heard and to "take any further action needed to complete the administrative record and issue a new decision." (AR 379.) Finally, Dr. Matzke did not perform his evaluation until after the district court and the Appeals Council ruled in Plaintiff's case. Thus, neither body could have addressed the findings of his report.

In the end, the Court concludes that there is enough evidence in this record to conclude that Plaintiff's mental impairment has more than minimally affected her ability to perform basic work activity. As such, her claim is not groundless and should have passed the *de minimis* screening test employed at step two. The ALJ's conclusion that Plaintiff did not meet this test is overruled.

D. <u>The ALJ's Credibility Determination</u>

In Plaintiff's third claim, she contends that the ALJ failed to provide clear and convincing reasons for rejecting her subjective complaints. (Joint Stip. at 22-24.) She complains that the ALJ erred when he found that she was non-compliant with her medications and when he further found that this signaled that she was not telling the truth. She argues that she was compliant and that, despite this fact,

she experienced seizures. Plaintiff also contends that the other reasons the ALJ gave to discount her credibility--that there was no evidence of muscle atrophy due to inactivity, that her daily activities were inconsistent with her claimed disability, and that she lived independently--were not legitimate. (Joint Stip. at 22-23.) For the following reasons, the Court finds that the ALJ's reasons for rejecting Plaintiff's subjective complaints were supported by the record.

Credibility determinations are the province of the ALJ. *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). In order to find a claimant not credible, however, an ALJ must provide specific, clear, and convincing reasons for doing so. *Thomas v. Barnhart*, 278 F.3d 947, 959-60 (9th Cir. 2002).

The ALJ determined that Plaintiff's claim that she suffered from seizures even when compliant with her medication was not supported by the medical record. (AR 312.) As set forth above in Section B of this decision, a fair reading of Dr. Kaufman's records supports the ALJ's finding in this regard. It appears that Plaintiff's seizures were effectively controlled when she took her medication as prescribed but that she frequently failed to do so. (AR 604-99.) An ALJ may rely on an unexplained (or inadequately explained) failure to follow a prescribed course of treatment as evidence that a claimant is not credible. *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991).

The ALJ also noted that examining doctor Kim concluded that Plaintiff showed no signs of having just suffered a seizure, despite her claim to him that she had one in his waiting room ten minutes before seeing the doctor. (AR 745.) The clear implication of this evidence is that Plaintiff was attempting to deceive the doctor and

feign a seizure, where none had occurred. Certainly, this was a proper consideration by the ALJ in assessing Plaintiff's credibility. *See Bunnell*, 947 F.2d at 346 (holding ALJ entitled to rely on ordinary techniques of credibility evaluation in assessing credibility).

The ALJ cited additional reasons for his credibility finding, including Plaintiff's daily activities and lack of muscle atrophy. Though the Court finds these reasons less persuasive, the ALJ's other reasons are adequate to support his finding and it is, therefore, affirmed.

E. Remand Or Reversal

Plaintiff asks the Court to reverse the Agency's decision and order a remand solely for the purpose of calculating and awarding benefits. She points out that the Agency has already had two chances to resolve her case and it should not be given a third, which will require an inordinate amount of time.

The Court recognizes that it has the power to award Plaintiff her requested relief, but concludes that this case does not warrant it. By finding that the ALJ erred in concluding at step two that Plaintiff's mental impairment was not severe, the Court has not reached the ultimate conclusion that Plaintiff is disabled. Rather, the Court solely concluded that the evidence shows that Plaintiff's mental impairment more than minimally affected her ability to work. Whether this impairment, when combined with her seizure disorder and taking into account her age, experience, and abilities, renders her disabled should, in the first instance, be decided by the Agency. Thereafter, if Plaintiff still disagrees with the Agency's decision,

she can return to this Court, at which time, assuming she can establish that the Agency erred again, the Court would be inclined to award benefits.

IT IS SO ORDERED.

DATED: March 18 , 2008.

PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\DAHMLOW, J 3991\Memo_Opinion.wpd